The opinion was delivered at the November term, 1852.
Shaw, C. J.
The case now presented is the petition of Edward I). Peters, an infant two or three years old, by Alexander Pope, his next friend, for a certiorari to the probate court for this county, to set aside and annul a decree of that court, allowing, approving and admitting to probate a will of Susan D. Peters, a married woman. Her will is produced, and purports to be made pursuant to an authority derived from an antenuptial contract, and to give all her estate, real and personal, to her husband, the father of the petitioner, who survived, and who has been cited to answer to this petition. He relies on the decree as final and conclusive; insists that no sufficient ground is shown for reversing it, if the court had jurisdiction; but further insists, that this court has no authority to issue a writ of certiorari in such a case, or to annul or reverse a decree of the probate court, otherwise than by appeal.
This is the first attempt, as far as we know, to invoke the power of this court as a court of general jurisdiction, and as such having a general supervising and controlling authority over other courts and tribunals, to interpose, either by certio *536 rari or writ of error, to reexamine and annul the decrees oi the probate courts of this commonwealth. It is a case oi great importance, since, if this power were affirmed and freely exercised, it would effect an almost entire change in that important department of judicial proceeding, which relates to wills, administrations, and the settlement of estates. The fact, that no authority is shown to warrant such practice, that no precedent is found, either for or against it, when so many cases of strongest interest to the rights of individuals would have called urgently for its exercise, though not conclusive, leads to a strong belief, that it does not exist, and should induce the most cautious examination.
The question appears to have been most thoroughly investigated by the learned counsel for the petitioner, who has presented to us the result of his researches in an able written argument, in which, we suppose, all the considerations favorable to the position taken, with all the authorities to support them, have been stated. At the same time, the counsel candidly admits, that certiorari to the probate court is a matter of entirely novel impression in this commonwealth.
The position taken in favor of this power is, that certiorari from this court lies to all inferior judicial tribunals, whose proceedings are not according to the course of the common law; that the probate court is such an inferior judicial tribunal, so proceeding; and therefore that this writ will lie; and in support of these propositions, many English and American authorities are cited.
Before referring to the English authorities, it may be proper to premise, that the peculiar and appropriate jurisdiction of the probate courts in the commonwealth, embracing the probate of wills, granting administrations, and their incidents, is precisely that which was and still is exercised by the ecclesiastical courts of Great Britain, which, within the sphere of their jurisdiction, as we shall have occasion to see hereafter, was exclusive of the secular courts; so that unless there is some English authority on the precise question of the power of the secular courts, the king’s bench for instance, to revise the decrees of ecclesiastical courts on these subjects, they can furnish *537 no authority for the present application. And in looking at the very thorough collection of authorities in the argument before us, no such case can be found. To examine a few of them: In The Cardiffe Bridge case, 1 Salk. 146, the application was for a certiorari, to certain justices in Wales, to examine their order in regard to the repairs of a bridge; and it was doubted, because these justices were within the jurisdiction of the court of grand sessions, which exercised the powers of the court of king’s bench in those counties; but the court decided, that whenever any new jurisdiction was erected, by private or public act of parliament, it was subject to the inspection of the court of king’s bench by writ of error, or by certiorari or mandamus. The same case is reported more at large in 1 Ld. Raym. 580. This assertion of, power is an assertion in general terms, but it relates solely to the subject matter, the judicial proceedings of inferior secular courts, subject to common law jurisdiction. In Groenwelt v. Burwell, 1 Salk. 144, which was certiorari to the college of physicians exercising a special jurisdiction under an act of parliament, the same general words are used, “ that a certiorari lies; for no court can be intended exempt from the superintendency of the Icing, in this court of B. R.” Broad as these words are, they are limited by the subject matter. In Bac. Ab, Certiorari, B. “ to what court certiorari lies,” the general proposition is stated, that the courts of chancery and king’s bench may award a certiorari to remove the proceeding from any inferior courts ; and although there is a very full enumeration of particulars, there is not one that intimates, that it will lie to the decrees of an ecclesiastical court. It is believed that the other elementary works will lead to the same result.
We think an examination of the American authorities will lead us to the same conclusion. 5 Dane Ab. 57, 85, 87, 95. Edgar v. Dodge, 4 Mass. 672, merely marks the distinction between error and certiorari, to reexamine the judgment < f a justice of the peace for a militia fine. Clark v. Commonwealth, 4 Pick. 126, was a criminal proceeding, commenced before a justice of the peace. Parks v. Boston, 8 Pick. 218, related to an order for widening a highway. In Cooke, Petitioner, 15 *538 Pick. 237, which was an information in the municipal court, for additional punishment upon a second or third conviction and sentence to the state prison, the distinction between erro.' and certiorari was stated.
We have not been able to examine all the cases cited from other states ; nor have we thought it very important, inasmuch as the practice and forms of proceeding differ so essentially from our own. For instance, it is manifest that Walker’s case, 2 Dall. 190, is similar only in name, and does not affect this question. A motion was made to the supreme court of Pennsylvania, probably the supreme court of probate, to affirm a decree upon a certificate, the appeal having been entered. But the court refused, saying: “ The regular mode of bringing up the record, [i. e. in case of appeal,] is by certiorari.” It apparently affects only the mode of carrying the record from the comt appealed from to the appellate comt.
Section 5 of Rev. Sts. c. 81, is cited, which gives this court power to issue writs of error, certiorari, &c. This is the general power, to be construed under the maxim reddendo singula singulis, and we are to look to other sources to learn which lies in any particular case. The proposition is laid down, and authorities cited to support it, that when error does not. lie certiorari will, and therefore that showing that error will not lie establishes the converse of the proposition. Rex v. Moreley, 2 Bur. 1040; The King v. Jukes, 8 T. R. 542. The remark in these cases applies to the secular courts, and does not go to the extent for which it is cited. Rev. Sts. c. 112, § 21, direct only the mode in which writs of certiorari shall issue, but do not describe the cases in which they may be the proper process.
But without pursuing the review of authorities further, at the present time, I propose to state the views of the court upon this subject, indicating why, in our view, a writ of certiorañ will not lie from this comt, under its general superintending authority, to the probate courts.
It is urged as a consideration lying at the foundation of this argument, that the comt of probate is a judicial court of" inferior jurisdiction — a proposition which we think may be *539 well called in question, regarding it in the sense in which it is used in the argument. In the relation which a court of original jurisdiction bears to an appellate court, it is inferior and subordinate to this court, as the supreme court of probate; so, when by statute, this court is authorized to make general rules to secure uniformity of practice in the probate courts, to a limited extent, and by force of the statute, they are subordinate. Rev. Sts. c. 83, §§ 9, 33. But in oúr view, the court of probate, like the ecclesiastical courts of Great Britain, to which it has constant reference, is a court of peculiar jurisdiction, having a separate and exclusive jurisdiction over an important class of subjects, particularly wills, administrations, and the settlements of the estates of deceased persons. This authority has long been considered as within the jurisdiction of the ecclesiastical courts, proceeding according to the civil law and the canons of holy church, juxta legem divinum, et cánones sonetee ecclesice. This matter is so fully set forth by Lord Coke, 4 Inst. c. 74, that it is sufficient at present to refer to his work. Having spoken of these ecclesiastical courts, and also of the temperal courts for the trial of lands and goods, he observes : “And certain it is, that this kingdom hath been best governed, and peace and quiet preserved, when both parties, that is, when the justices of the temporal courts and the ecclesiastical judges, have kept themselves within their proper jurisdiction, without encroaching or usurping one upon another.” 4 Inst. 321. This is the germ and origin of this system of entire separation of these jurisdictions. And to maintain and preserve this separation, a series of appellate courts is provided, not now necessary to be enumerated, who are to act as appellate courts, wholly distinct from the secular courts, who are vested with authority to act on questions and subjects of spiritual jurisdiction, including the probate of wills and the administration of estates. It might be useful to examine this subject further, but it is not now practicable.
It will appear that each jurisdiction, acting within its proper sphere, was cautious not to encroach on the proper and just jurisdiction of the other; and for that reason, the seculai *540 courts never interfered by way of writ of error, or writ of cez‘iorari or mandamus, processes devised to reexamine and affirm or reverse judicial decrees; but merely by writs of prohibition and other processes, designed to restrain and prevent them from the exercise of a jurisdiction not conferred upon them. The superior courts of Westminster have a jurisdiction over all other courts, to keep them within the boundaries of their jurisdiction; and if they assume a greater power than is allowed them by law, they will be restrained by prohibition. And the same rule applies to marine and military courts, exercising a peculiar jurisdiction. Bac. Ab. Prohibition. They act negatively to restrain, not affirmatively'to reverse; whereas in error and eertiorwri.it is otherwise.
Such was the state of the law when our English ancestors emigrated to this country, under the colony charter. This charter not having been framed, as is familiarly known, with a view to the establishment of a civil and political government, but rather to govern a commercial and land corporation, was adapted to their wants as well as it ■ could be under the circumstances. They were deeply imbued with the spirit of the English law, but retained no more of its forms and modes of proceeding than were necessary to their condition and wants. The powers vested in the governor and assistants, to govern the company and their settlements, were conferred in broad and general terms, and under them they established such courts and tribunals as their necessities required. They constituted county courts, giving them jurisdiction in common law, probate and equity, with an ultimate appeal to the governor and assistants. Thus the matter stood until the dissolution of the colony charter.
By the province charter of William and Mary, in 1691, although an authority was given to the general court to erect and constitute judicatories and courts of record for the purpose of hearing, trying and determining all crimes, actions and causes whatever, yet an authority was given, in terms, to the governor for the time being, with the council or assistants, to do, execute and perform all that is necessary for the probate of wills, and granting of administrations &c. within said *541 province. The government did establish judicatories, for all cases civil and criminal, to wit, a supreme court, courts of common pleas, courts of sessions and justices of the peace, but none for probate jurisdiction. It is understood that an act was passed by the provincial legislature for erecting county courts of probate, which was negatived by the king, and no statute establishing such courts, or providing for the appointment of judges and registers of probate, was enacted until since the adoption of the constitution. Thus the jurisdiction of these subjects, remaining exclusively with the governor and council, became wholly distinct from that of the common law courts, • Parsons, C. J., in Wales v. Willard, 2 Mass. 124. The governor and council being thus vested with the whole power on this subject, by their general authority appointed judges of probate in each county, who were in effect surrogates, exercising a delegated authority, but with a general right of appeal to the governor and council. Under this organization, courts of probate were in fact established and judges of probate appointed; and although provincial statutes were made from time to time, recognizing their existence and to some extent regulating their proceedings, yet there was none prescribing or defining their powers, or placing them under the jurisdiction of the common law courts. The judicial proceedings in matters of probate were wholly independent, subject only to the appellate jurisdiction. White’s Jurisdiction of Probate Courts, 17, 20. Thus the distinction and entire separation between the jurisdiction of the ordinary or ecclesiastical court, and that of the common law courts, with which all those conversant with the law and practice óf England were always familiar, became as well settled in this province as in England.
The constitution of 1780 to some extent contemplated a similar separation. It provided, in c. 1, § 2, art. 3, for the establishment of all judicatories; in c. 3, art. 4, for the regulation of times and places for holding of probate courts; and then provides, c. 3, art. 5, that “ all causes of marriage, divorce and alimony, and all appeals from the judges of probate, shall be heard and determined by the governor and council, until the *542 legislature shall by law make other provision.” This system continued in actual operation until the passing of St. 1783, c. 46, on the 12th of March, 1784, for establishing courts of probate. That provided for the appointment of judges and registers of probate, prescribed their jurisdiction, and vested them with full authority, by proper process, to carry it into effect. It provided, that the supreme judicial court should be the supreme court of probate for the commonwealth, and have appellate jurisdiction of all matters determinable by the judges of probate in their respective counties. Section 4 gave an appeal to any person aggrieved by any decree, order or denial, and directed the time and mode of prosecuting it, with a provision for an affirmation in the supreme court of probate, if the appellant failed to prosecute his appeal, with a saving clause in favor of those beyond sea. Here, the supreme judicial court is constituted the supreme court of probate. This appellate jurisdiction is vested in the same court indeed, with that from the common law courts, and that for a very wise reason, that there might not be conflicting decisions between two supreme courts, administering the same laws ; but in another and distinct capacity, as if it had been a distinct court. It provided for a supreme court, having a superintending and revising power, to reexamine, and affirm or reverse, all orders and decisions in probate, but as an appellate probate court. It maintains the same distinction, before maintained, between the ecclesiastical courts and the common law courts. And we think good reasons may be discerned for this distinction. The proceedings of the probate courts affect a great class and variety of interests which require prompt and decisive action. If a party dies leaving property, with or without a will, there is an urgent necessity that somebody act soon and act definitively. Property must be taken possession of, actions brought, real estate sold, titles given, accounts settled, guardians appointed, distributions made; if all these were subject to be drawn in question and revised before the common law courts, at such time as any person interested, within the limited term of six years might think fit to move, it would be attended by very disastrous consequences. We believe that when the *543 legislature vested this jurisdiction in judges of probate, and created a supreme court of probate with a full appellate jurisdiction, allowing an appeal within a short limited time, with a power in this court to enlarge that time in case of accident or mistake, they did all they intended to do, in providing for the revision of decrees in probate matters by appeal.
We think this has been the construction put upon it by a series of judicial decisions; not indeed expressly declaring any such judicial opinion, but by opinions and dicta, which assume this as the nature and character of this jurisdiction. Tt is found in the often repeated statement, everywhere admitted and relied on strenuously in this argument for the petitioner, that a writ of error does not lie to a judgment of the probate court. But why does it not lie ? Not because it is not the right form of process; but because it would be giving a direct control to the common law courts over a decree or judgment of the probate court. If this is the true reason, it is equally strong against a writ of certiorari, which would have the same effect. The same conclusion we think follows from another series of judicial decisions and dicta, — that if the probate court, even where it has jurisdiction over the general subject, exceeds its powers, or acts in a manner prohibited by law, its decrees are not regarded as merely irregular, and voidable, but yet good and valid, unless reversed, like other erroneous or irregular judicial proceedings; but they are held entirely and absolutely void and of no effect, and may be set aside in any collateral proceeding by plea and proof. This would not be true, if they could be drawn in question and vacated by a writ of certiorari. Thus, where original administration was granted after twenty years, contrary to the statute, it was held void in a collateral suit, and for the reason mentioned. Wales v. Willard, 2 Mass. 120; Hwnt v. Hapgood, 4 Mass. 117. The subject was more fully considered and developed in an able opinion of Mr Justice Jackson, in Smith v. Rice, 11 Mass. 507, 512. He says, it is undoubtedly true, that in cases where the probate court is acting within its jurisdiction, pursuing the course prescribed by law, if there is an indiscreet exercise of authority, the only remedy of the party *544 aggrieved is by appeal. And he afterwards adds: “ The defect [which renders the decree irregular and illegal] is not confined to what may be considered strictly a want of jurisdiction of the cause; but if the inferior tribunal proceed in a manner prohibited or not authorized by law, the proceeding is void.” 11 Mass. 513. The same thing is declared in the close of an elaborate opinion of Chief Justice Parker, in Chase v. Hathaway, 14 Mass. 227. Speaking of the importance of preserving full records of notices and other proceedings in the probate office, he says: “ It is the more important, as any material defect will render the proceedings null, at any period, when they shall be brought in question ; it having been determined, that orders and decrees of these courts may be avoided by plea; they not being, like judgments of common law, reversible by writs of error.” These citations might be multiplied. The cases all assume, that a decree, which in other courts would be voidable, shall be held wholly void, because it cannot be reexamined and reversed in a common law court, by a common law process, but only in the supreme court of probate on appeal.
2. But there is another and distinct ground upon which it is insisted, that if this court had jurisdiction to grant this petition and issue a certiorari to the probate court, it ought not to be done in the present case. The fact relied on is, that before the decree was passed admitting the will of Susan B. Peters to probate, and before proceeding to act upon the application therefor, the judge of probate appointed Joseph P. Ellicott, as a guardian for the occasion, to act for and represent the petitioner, then and still an infant, that it was perfectly competent for the petitioner, by his said guardian, to oppose and resist the probate of said will for any good reason, and to appeal from the decree by which it was approved and allowed, to the supreme court of probate.
These facts, appearing in the probate proceedings, do appear to us to constitute a good answer to this petition, and a good reason why a writ of certiorari ought not to be granted. The claim on which the petition is founded is, that the petitioner being sole heir at law of the testatrix, had a deep interest in *545 setting aside the will; that he was of tender age, wholly incapable of acting for himself, and of course under legal disability, and therefore ought not to be barred. But the very purpose of the appointment of a guardian, was to supply that want of capacity, to remove the disability, and enable the judge to proceed and act, where others besides the infant were concerned, and that without injury to the rights of the infant. If he was incapable of personally acting then, he is equally so now. If he could not do binding acts, and be bound by the acts of his guardian, we cannot see how he can be more bound by the acts of a prochein ami. If the appointment of a guardian under those circumstances does not give efficacy to the judicial proceeding of proving a will, we do not see how a will can be definitively proved during the minority of any person resisting it. An estate might be so situated, that by the time that some infants would come of age, others might be born having like interests, so that it would be difficult ever to establish a will, so that it might not be drawn in question after-wards by certiorari. We have stated, in the former part of this opinion, the cogent reasons why a subject, on which so many dependent and derivative rights, interests and duties are founded, as that of the probate of a will, or the grant of letters of administration, should be speedily and definitively settled. The power vested in judicial tribunals to appoint guardians ad litem, to supply the want of capacity and provide for the security and protection of persons under disability, seems wisely designed, and perfectly adapted to protect the rights of such persons, so that the regular administration of justice may proceed, without serious danger of injury or oppression to weak and incapable persons.

Petition dismissed.